# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | 3:08 - cr - 0211 (CSH) |
| DWAYNE JACOBS, | |
| Defendant. | |

## RULING ON SENTENCE

HAIGHT, Senior District Judge:

Defendant Dwayne L. Jacobs pled guilty to a narcotics offense and is awaiting sentencing by this Court. The case, together with many others in the federal system, presented this issue: On which date should the new mandatory minimum sentences in the Fair Sentencing Act of 2010 ("FSA"), which became effective on August 3, 2010, begin to apply to unsentenced defendants? The Court adjourned Jacobs's sentencing to further consider the issue, in the light of recent intervening developments in the Congress, the United States Sentencing Commission, the United States Department of Justice, and several circuit courts of appeal. The defendant and the government have submitted supplemental briefs discussing these new developments. In this Ruling, the Court announces the sentence it imposes upon Jacobs and gives its reasons for that sentence. The relevant dates and developments are summarized as follows.

Between April and August 2008, Jacobs and another individual engaged in an agreement to possess and distribute to others quantities of cocaine base. Following surveillance and information

from an undercover informant, Stamford, Connecticut police arrested Jacobs on conspiracy and substantive charges arising out of trafficking in crack cocaine. On October 21, 2008, a federal grand jury in this District indicted Jacobs for those narcotics offenses.

On November 23, 2009, Jacobs pled guilty to Count One of the indictment, which charged him with conspiracy to possess with intent to distribute and to distribute 5 grams or more of cocaine base, in violation of 21 U.S.C. § 846 and § 841(a)(1), (b)(1)(B). At the plea hearing the parties executed and the Court received a Plea Agreement letter dated November 23, 2009 ("PA"), which detailed the circumstances, nature, and effect of the plea. Following Jacobs's allocution in the proper form, the Court accepted his plea to Count One and remanded him pending sentence.

The Court scheduled Jacobs's sentence for March 14, 2011.[1] Prior to that date, the Probation Department submitted a Presentence Report ("PSR"). The PSR concluded that Jacobs was subject to a statutory 10-year mandatory minimum sentence, basing that conclusion upon the recitation in the PA at 2 that "both the defendant and the Government acknowledge that the defendant committed the instant offense after a conviction for a felony drug offense had become final," subjecting Jacobs "to a minimum term of imprisonment of 10 years and a maximum of life" pursuant to 21 U.S.C. §§ 841(b)(1)(B) and 851. The PSR also agreed with the government that Jacobs should be treated as a career offender pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 4B.1(a), resulting in a Criminal History Category of VI, a conclusion to which Jacobs preserved and presses his objection. The PSR calculated the Guidelines range as 262 to 327 months and recommended a

---

[1] The times between the dates of Jacobs's indictment and plea, and his plea and scheduled sentencing, were extended by a series of continuances agreed to by the parties and granted by the Court, all in compliance with the Speedy Trial Act. It is not necessary for present purposes to recite the circumstances of those continuances.

sentence of imprisonment of 180 months, but in no event less than 120 months, the perceived 10-year mandatory minimum.

While Jacobs pleaded to a conspiracy involving "5 grams or more" of cocaine base, the Probation Department reviewed the record and concluded that "[t]he total net weight of all cocaine involved regarding this case was 8.37 grams." PSR ¶¶ 22. Defendant accepts that amount as accurate.

When Jacobs committed his criminal conduct, the penalties imposed by the governing statute drew distinctions between whether the substance involved was powder cocaine or cocaine base ("crack"). Congress regarded crack cocaine as more dangerous, addictive and disruptive of the social fabric than powder cocaine. In consequence, with respect to mandatory minimum terms of imprisonment the statute contained a 100:1 ratio between powder and crack cocaine. Thus 500 grams of powder cocaine was the sentencing equivalent of 5 grams of crack cocaine. Possessing with intent to distribute crack cocaine triggered a five-year mandatory minimum term of imprisonment if the amount was 5 grams or more, and a ten-year mandatory minimum if the amount was 50 grams of more. As a result of the 100:1 ratio, possession of like amounts of powder cocaine would not trigger any mandatory minimum sentence.

There was almost immediate and widespread criticism of the draconian differences imposed upon narcotics distributors dealing in crack as opposed to powder cocaine. Convicted defendants in the Second Circuit repeatedly and unsuccessfully argued to that court that "the mandatory sentencing scheme in former 21 U.S.C. § 841(b) violates the equal protection component of the Fifth Amendment, because there is no rational basis for the disparity between sentences for crack and powder cocaine. We have repeatedly rejected this argument." *United States v. Acoff*, 634 F.3d 200,

202-03 (2d Cir. 2011) (citing cases, the earliest decided in 1994). It became apparent that if Congress had created an untenably unfair sentencing scheme in the original statute, Congress would have to remedy the consequences of its own legislation.

Congress attempted to do so in 2010 when it enacted the FSA, appropriately titled "the **FAIR** Sentencing Act." The FSA reduced the statutory penalties for crack cocaine offenses, eliminated the statutory mandatory minimum for simple possession of crack cocaine, and in respect of possession with intent to distribute reduced the ratio between powder and crack cocaine from 100:1 to 18:1. The result of that ratio reduction was to increase the crack cocaine quantity threshold required to trigger the 5-year mandatory minimum term of imprisonment from 5 grams to 28 grams, and the 10-year mandatory minimum term from 50 grams to 280 grams.[2] The FSA also directed the United States Sentencing Commission to promulgate new sentencing guidelines for crimes involving crack cocaine, and to do so within 90 days of the statute's enactment. FSA became effective on August 3, 2010 and the Commission promulgated new guidelines on November 1, 2010.

The FSA demonstrates that Congress is as inept in remedying an unfair statute as it was in enacting it in the first place. The FSA does not state whether its remedial provisions are intended to operate retroactively. The question makes a profound difference to a defendant who trafficked in cocaine. If the FSA applies retroactively from its effective date of August 3, 2010 to the date of the criminal conduct, or from that date to the date of sentencing of a convicted defendant awaiting sentence, the FSA's more lenient protocols apply to that defendant. Jacobs falls within the second

---

[2] In the case at bar, the total amount of crack cocaine involved was 8.37 grams, which under the statute at the time of Jacobs's criminal conduct would subject him to a 5-year mandatory minimum term of imprisonment. However, Jacobs and the Government agree that this mandatory term would be doubled to 10 years because of Jacobs's prior narcotics offenses, described *infra*.

-4-

group of that universe. If the FSA applies only to future conduct, as measured by the Act's effective date, Jacobs must be sentenced under the former statute's now repudiated 100:1 powder cocaine/crack cocaine ratio.

Congress ignored the question of retroactivity, although it was of obvious importance to the FSA's remedial purpose. In consequence, district courts and courts of appeal have had to deal with a Legion of sentencing cases ever since. This case is typical. At the sentencing hearing on March 14, 2011, Jacobs argued for the FSA's retroactive application. The government responded that the FSA had no retroactive effect and could not have. In pressing that latter contention, the government relied upon the General Savings Statute, 1 U.S.C. § 109, which provides that "[t]he repeal of any statute shall not have the effect to release or extinguish any penalty . . . incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty." Defendants in the Second Circuit had consistently argued that the savings statute does not foreclose retroactive application of the FSA, but the Court of Appeals repeatedly rejected the argument. *United States v. Diaz,* 627 F.3d 930 (2d Cir. 2010); *United States v. Acoff*, 634 F.3d 200 (2d Cir. 2011).

In *Acoff* the defendant, unlike the defendant in *Diaz*, had not yet exhausted his appeals when the FSA came into force, but the Second Circuit dismissed the distinction as of no moment to its analysis. 634 F.3d at 202. Each case denied retroactive effect to the FSA and subjected each defendant to the mandatory minimums contained in the former statute. Acoff's case was still on appeal when the FSA was passed, so his sentence was not yet final, but the court of appeals denied FSA retroactive application because it regarded the date of the criminal conduct as controlling

under the savings statute.[3]

However, there was a continuing awareness that without retroactivity, the unfairness the FSA sought to remedy had not been entirely eliminated. The tectonic plates began to shift. The First, Third, and Eleventh Circuits have held that the FSA – while not applying to defendants like Diaz and Acoff, who were sentenced before August 3, 2010 – did apply to defendants who were sentenced after the date when the FSA became effective, regardless of when the offense was committed. *United States v. Douglas*, 644 F.3d 29 (1st Cir. 2011); *United States v. Rojas*, 645 F.3d 1234 (11th Cir. 2011); *United States v. Dixon*, 648 F.3d 195 (3d Cir. 2011).

On July 15, 2011, Attorney General Holder announced that it would henceforth be the position of the Justice Department that the FSA was intended to and did apply to defendants who committed their crimes before August 3, 2010, the effective date of the statute, but were sentenced thereafter. *See* Holder, *Memorandum for All Federal Prosecutors*, dated July 15, 2011. The Attorney General adhered to the position that defendants who were sentenced prior to the effective date of the FSA did not fall within its ambit, a view with which the Third Circuit concurred when it decided *Dixon* on August 9, 2011.

Obedient to the Attorney General's policy directive, on July 18 the government filed in this case its supplemental sentencing memorandum [Doc. 188], which advised defendant and the Court of the government's conclusion that "Congress intended that the new penalties would apply to all federal sentencings that take place on or after the FSA's effective date, *i.e.*, August 3, 2010." [Doc. 188] at 1. It followed, the government continued, that "the defendant is not subject to a mandatory

---

[3] In *Acoff,* while each of the three appellate judges wrote separate opinions whose reasoning cannot entirely be reconciled, the resulting compilation is curiously designated *per curiam*.

minimum term of imprisonment because the quantity of cocaine base involved in this offense was less than 28 grams, *i.e.*, the threshold amount triggering a five-year mandatory minimum penalty under the FSA." *Id*. at 2.

Not surprisingly, defendant's supplemental memoranda agree with the government's conclusions concerning the FSA's retroactivity and its effect upon mandatory minimums. Somewhat surprisingly, defense counsel feels it necessary to argue in its amended reply sentencing memorandum that "the Court has the inherent authority to apply the FSA" to this case, a perceived necessity seemingly deriving from counsel's observation that "there is no controlling precedent in the Second Circuit involving the set of facts which exist here." [Doc. 191] at 1-2. Accepting that proposition for the sake of analysis, the absence of controlling Second Circuit precedent leaves me uncontrolled (relatively speaking) and consequently free to decide the issue. I conclude without difficulty that on the question of the FSA's retroactive effect, the First, Third and Eleventh Circuits and the Attorney General got it right. Accordingly, the FSA applies to the sentence to be passed in this case.[4]

The remaining issues include the applicability and effect of the Sentencing Guidelines. The government's supplemental memorandum, after acknowledging the applicability of the FSA, contends that "the FSA does not affect the defendant's eligibility for treatment as a career offender

---

[4] There is no Second Circuit squarely on point. In a pending case, *United States v. Bush*, No. 10-4156 (2d Cir.), the Second Circuit will apparently decide whether a defendant who, like Jacobs, committed a crack cocaine offense before the FSA enactment but was sentenced after it, may seek the retroactive benefit of the FSA. Given that the affirmative conclusion I reach in text is based in part on decisions of other circuits, counsel and the Court in this case must keep *Bush* in mind, but the pendency of that case does not provide a sufficient reason to further delay Jacobs's sentencing.

under U.S.S.G. § 4B1.1," the career-offender Guideline. [Doc. 188 at 2].[5] Defendant's briefs do not quarrel with that proposition, concentrating solely upon the applicability of the career-offender Guideline to him on the particular facts of this case. There is Second Circuit authority for the proposition that Guideline § 4B1.1 is impervious to the recent changes in cocaine sentencing. *See United States v. Lucas*, No. 09-4745-cr., 2011 WL 4347174 (2d Cir. Sept. 19, 2011), at *1 ("Although the sentencing guidelines pertaining to crack cocaine offenses were subsequently amended to lower the applicable offense levels, defendant was sentenced under the career offender guideline, which remains unchanged."); *United States v. Martinez*, 572 F.3d 82, 85 (2d Cir. 2009) ("We now join our sister Circuits in holding that a defendant convicted of crack cocaine offenses but sentenced as a career criminal under U.S.S.G. § 4B1.1 is not eligible to be resentenced under the amendments to the crack cocaine guidelines."). That principle would seem to apply equally to statutory amendments in respect of cocaine offenses. Neither party contends otherwise.

Thus, I must determine whether Jacobs should be regarded as a career offender under § 4B1.1 of the Sentencing Guidelines. Although the Guidelines are now advisory rather than mandatory, nonetheless "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Savage*, 542 F.3d 959, 963-64 (2d Cir. 2008) (citing and quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). The applicability *vel non* of the career offender Guideline makes a profound difference to a defendant, transforming him to a Criminal History Category of VI, the highest. In Jacobs's case, application of the career offender Guideline to him results in a Guidelines range of 262 to 327 months. If Jacobs is not sentenced as

---

[5] "Eligibility for treatment," with its echo of social security entitlement to benefits, is an odd phrase to apply to Jacobs and the career-offender guideline, which if applicable would substantially increase his term of imprisonment.

a career offender, his Guidelines range is 41 to 51 months.

Under the Guidelines, a defendant should be sentenced as a career offender "if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1(a). A "controlled substance offense" is "an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense." § 4B1.2(b).

To determine whether a prior conviction constitutes a "controlled substance offense" under the Guideline, the Second Circuit has adopted a "modified categorical approach." *Savage*, 542 F. 3d at 964 (citing and quoting *United States v. Brown*, 514 F.3d 256, 265 (2d Cir. 2008)). First, the court must look to "whether the statute of the prior conviction criminalizes conduct that falls exclusively within the federal definition of predicate offense." *Id*. If so, that ends the inquiry. If not, the court must determine whether "the government has shown that the plea 'necessarily' rested on a fact identifying the conviction as a predicate offense." *Id.* at 966 (citing *Shepard*, 544 U.S. at 26).

With respect tp Jacobs, the PSR recommends that he be sentenced as a career offender, based upon previous felony convictions under Conn. Gen. Stat. § 21a-277(a). The government concurs, arguing that two of Jacobs's prior state convictions should be considered controlled substance

-9-

offenses, thus making a career offender under the Guidelines.

Jacobs objects to this conclusion and asserts that the government cannot prove that the convictions meet the standard for controlled substance offenses. *See Savage*, 542 F.3d at 964 (explaining that "[t]he government bears the burden of showing that a prior conviction counts as a predicate offense for the purpose of a sentencing enhancement."). *Savage* further holds that "a conviction under [§ 21a-277(a)] cannot categorically qualify as a 'controlled substance offense' with the meaning of the Guidelines § 4B1.2(b) because the Connecticut Statute criminalizes some conduct that falls outside the Guidelines' definition." *Id*. at 964-65. Expanding upon that proposition, the *Savage* court said in language squarely applicable to the case at bar:

> At the narrowest, Savage pleaded guilty to a "sale" of a controlled substance. Because a "sale" under Connecticut law includes a mere offer to sell drugs, and an offer to sell drugs is not a controlled substance offense, the conviction does not qualify as a controlled substance offense.

*Id*. at 967.

Therefore the Court must inquire whether Jacobs' previous pleas *necessarily* rest on facts that would constitute a predicate offense. The government bears the burden of making that showing with respect to *two* prior convictions, because Guidelines § 4B1(a) requires that in order to impose enhanced sentencing upon a career offender, the government must show he has "at least two prior felony convictions of either a crime of violence or a controlled substance offense." While that showing may be made by reference to plea proceedings, in that event "the dispositive question is whether the plea colloquy establishes, with certainty, that the plea necessarily rested on the fact, identifying the conviction as a controlled substance offense." *Savage*, 542 F.3d at 967 (citation and internal quotation marks omitted).

To support its argument that Jacobs' state convictions satisfy the career offender Guideline, the government provides the two certified court records of conviction and the transcript of the plea colloquy. The court records show that on the same day and during the same appearance, Jacobs pleaded guilty to two separate charges of violating Section 21a-277(a) before Judge Rodriguez in the Connecticut Superior Court, the date being May 17, 1999. The first conviction, docket number 120819, was based on conduct occurring on October 13, 1997. The second, docket number 124420, was based on conduct occurring on July 31, 1998. Both court records identify the crime pleaded to as "Sale of Narcotics."

The plea colloquy transcript provides some further detail about the pleas. For the July 31, 1998 count, the state attorney identified the charge as "possession of narcotics with intent to sell," and Jacobs pleaded guilty. After this plea, the state attorney explained that police officers observed Jacobs selling crack cocaine, arrested him, and found a 0.1 grams of "a white powdery substance" on his person.

For the October 13, 1997 count, the state attorney identified the charge as "sale of narcotics," and Jacobs pleaded guilty to that charge as well. The state attorney then described the facts of that charged conduct as follows:

> Your honor, this incident occurred on October 13th, 1997. The area of Stillwater Avenue in Stamford. Police officers saw the defendant with two other individuals walking down Stillwater Avenue. All three were known for having prior drug arrests. They were known not to live in that area. Police officers watched them walk down the street.
>
> Apparently, eye contact was made between the defendant and the police officers in the cruiser. At that time they saw the defendant throw an item on the ground. I believe it was a plastic bag. And the police officers went up to the area where it was thrown by the defendant and it contained—they opened it up and it contained several ziplock bags which was packaged—which were consistent

-11-

> with sale. And when they arrested the defendant, I believe he said
> ["]oh, you got me, you know you got me.["]. And he was then
> arrested. Total amount of the drugs—of the cocaine, it was field
> tested and proved to be cocaine 2.9 grams.

It is striking that during this proceeding, Mr. Ferencek, the prosecutor, and not Judge Rodriguez, asked Jacobs "How do you plead, guilty or not guilty," Jacobs said "guilty," and Mr. Ferencek then summarized the facts from the police's point of view. That format was followed with respect to each of the two charges. When Judge Rodriguez came to question Jacobs, he asked if Jacobs had "heard what the prosecutor summarized here in each case"; if Jacobs "agree[d] with his summary of the facts"; and lastly: "A lot more happened than what he said. But what he said, you are in agreement with, is that correct?" Tr. 7. To each of these three questions, Jacobs responded with a simple "yes," without adding details or having to respond to follow-up questions. That is the extent of the plea colloquies covering both of the prior convictions upon which the government relies to brand Jacobs a Guidelines career offender. Judge Rodriguez then sentenced Jacobs "[o]n docket ending in 120819, possession of narcotics. Four years to serve. Docket ending in 98-124470, four years to serve concurrent."

I do not think these barebones colloquies pass muster under *Savage*. There are several inconsistencies in the colloquy and court records, as both the government and Jacobs acknowledge. First, in the transcript, the judge states that he sentencing Jacobs for the October 13, 1997 offense for "possession of narcotics" rather than the "Sale of Narcotics" as the certified court record of conviction states. Second, for the July 31, 1998 offense, the court record states that the conviction is for "Sale of Narcotics" while the prosecutor described the offense as "Possession of narcotics with intent to sell." Moreover, in the state attorney's recitation of the facts of the October 13, 1997 conviction, he does not clearly state that the 2.9 grams of cocaine were packaged in multiple small

-12-

bags.

The Court must determine whether, with respect to each of these prior convictions, the state judicial records of the state conviction establish with "certainty" that the guilty plea "necessarily" admitted elements of a Guidelines predicate offense. I accept *dubitante* that if the October 13, 1997 charge and colloquy stood alone, they would demonstrate a conviction necessarily for the sale of narcotics, a predicate offense under the career offender Guideline.

But the proceeding before Judge Rodriguez dealt with two intertwined charges and pleas, with Jacobs's statements *as to both* limited to two utterances of "guilty" and three utterances of "yes." I am not satisfied that the court record concerning the July 31, 1998 conviction, when considered together with the October 13, 1997 charge disposition (as I must, because the charges and pleas were disposed of in a single colloquy and plea proceeding before the state court), demonstrates with *certainty* that Jacobs pleaded guilty to a predicate offense under the career offender Guideline. Not only do the plea colloquy and certified record of conviction conflict as to the offense that Jacobs was sentenced for (possession of narcotics with intent to distribute versus sale of narcotics, respectively), but the prosecutor's less detailed factual recitation of the basis of the conviction, quoted *supra*, does not satisfy the Court to a certainty that, in respect of the July 31 incident, during the proceeding *Jacobs* admitted to facts sufficient to establish that he *certainly* and *necessarily* pleaded to a predicate offense, either sale or possession with intent to distribute. And, of course, the words offered to establish the key fact must come from Jacobs's mouth, and no other source.

For these reasons, the Court concludes finds that the government has not shown Jacobs was convicted of the two prior felonies that would subject him to sentencing as a career offender under

the Guidelines. In consequence, Jacobs's Guideline range is 41 to 51 months, based upon his conviction for the charge of conviction which involved 8.37 grams of cocaine base.

The Court will sentence Jacobs to a Guidelines sentence of 41 months, at the low end of the range, with time served to count. While Jacobs's criminal record is troublesome and his offenses are serious, the thorough and balanced PSR report demonstrates convincingly that when Jacobs, having been deprived of his parents at an early age, came under the care of an able and compassionate grandmother, his behavior was much improved; it was the loss of that good woman that restarted the defendant's downward spiral. I conclude that a Guidelines sentence at the low end of the range complies with the sentencing factors and purposes listed in 18 U.S.C. § 3553(a), (a)(1)-(2), and (b)(1). I have considered each factor and purpose applicable to the case, with particular reference to § 3553(a)'s command that the sentence be "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." In addition to that first and greatest sentencing commandment, I conclude that a 41-month sentence gives appropriate consideration to the history and characteristics of this particular defendant, § 3553(a)(1); sufficiently reflects the seriousness of these narcotics offenses, which while grave in nature are modest in amount; promotes respect for the law; provides a just punishment for Jacobs's offense; an adequate deterrence to criminal conduct; and protection of the public from the defendant, §§ 3553(a)(2)(A),(B), and (C); and falls within the Guidelines range, § 3553(b)(1). A separate Order of Judgment and Conviction will enter accordingly.

It is SO ORDERED.

Dated: New Haven, Connecticut
November 2, 2011

                */s/ Charles S. Haight Jr.*

                              Charles S. Haight, Jr.
                              SENIOR UNITED STATES DISTRICT JUDGE